## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

THE METROPOLITAN TRANSPORTATION
AUTHORITY DEFINED BENEFIT PENSION
PLAN MASTER TRUST, THE
MANHATTAN AND BRONX SURFACE
TRANSIT OPERATING AUTHORITY
PENSION PLAN and THE PLYMOUTH
COUNTY RETIREMENT ASSOCIATION,
Individually and on behalf of all others
similarly situated,

Case No. 8:18-cv-3007

Judge James S. Moody, Jr.

                                    Plaintiffs,

v.

WELBILT, INC., HUBERTUS M.
MUEHLHAEUSER, JOHN O. STEWART and
HARESH SHAH,

                                    Defendants.

## AMENDED CLASS ACTION COMPLAINT FOR
## VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Lead Plaintiffs the Metropolitan Transportation Authority Defined Benefit Pension Plan Master Trust ("MTA Master Trust"), the Manhattan and Bronx Surface Transit Operating Authority Pension Plan ("MaBSTOA Pension Plan") and the Plymouth County Retirement Association ("Plymouth") (collectively with MTA Master Trust and MaBSTOA Pension Plan, the "Lead Plaintiffs"), individually and on behalf of all others similarly situated, by Lead Plaintiffs' undersigned attorneys, allege the following based upon personal knowledge as to Lead Plaintiffs' own acts, and upon information and belief as to all other matters based upon the investigation conducted by and through Lead Plaintiffs' attorneys, which included, among other things, a review of United States Securities and Exchange Commission ("SEC") filings by Welbilt, Inc.

1

("Welbilt" or the "Company"), as well as regulatory filings and reports, securities analyst reports and advisories of the Company, press releases and other public statements issued by the Company, and media reports about the Company. Lead Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery:

## I.   <u>NATURE OF THE ACTION</u>

1.      This is a federal securities class action on behalf of all persons or entities who purchased or acquired Welbilt's common stock ("common stock" or "stock") between February 24, 2017 and November 2, 2018, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' (defined below) violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officers.

2.      During the Class Period, Defendants knowingly misled investors by artificially inflating the price of Welbilt's common stock by issuing statements that the Company maintained effective internal controls over financial reporting throughout the entirety of the Class Period. Defendants issued these statements through, *inter alia*, annual and quarterly reports to investors filed with the SEC.

3.      However, these statements were materially false and misleading because Defendants concealed material adverse facts from investors, namely, that the Company did not maintain effective internal controls over financial reporting and this lack of effective internal controls lead to the Company having to revise and restate previously issued financial reports and to disclose additional record-keeping failures.

4.      The repeated false and misleading statements regarding the effectiveness of the Company's internal controls over financial reporting misled the investing public regarding Welbilt's business, operations, management and the intrinsic value of its common stock and caused Welbilt's stock to be artificially inflated throughout the Class Period.

5.      On November 5, 2018, the Company disclosed material weaknesses in Welbilt's internal controls and informed investors that they could no longer rely on previously issued financial reports from 2015 to 2018 leading to revisions and restatements associated with the inadequate internal controls.  On these revelations, Welbilt's share price fell $5.06, or 26.19%, to close at $14.26 on November 5, 2018.

6.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's stock, Lead Plaintiffs and the Class members suffered significant losses and damages.

## II.    <u>JURISDICTION AND VENUE</u>

7.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

8.      This Court has subject matter jurisdiction over this action pursuant to Section 27 of the Securities Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.  This Court has personal jurisdiction over each Defendant named herein because each Defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.

9.      Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa), and 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred this District.  Moreover, Welbilt maintains its principal place of business in this District.

10.     In connection with the acts, conduct and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the United States mails, interstate telephone communications, and the facilities of a national securities exchange.

## III.   PARTIES

11.     Lead Plaintiff MTA Master Trust purchased Welbilt's common stock at artificially inflated prices during the Class Period and, as a result, was damaged thereby as set forth in its PSLRA certifications previously filed with the Court that are incorporated by reference herein. *See* ECF Nos. 5-7.

12.     Lead Plaintiff MaBSTOA Pension Plan purchased Welbilt's common stock at artificially inflated prices during the Class Period and, as a result, was damaged thereby as set forth in its PSLRA certifications previously filed with the Court that are incorporated by reference herein. *See* ECF Nos. 5-7.

13.     Lead Plaintiff Plymouth purchased Welbilt's common stock at artificially inflated prices during the Class Period and, as a result, was damaged thereby as set forth in its PSLRA certifications previously filed with the Court that are incorporated by reference herein. *See* ECF Nos. 5-7.

4

14.     Defendant Welbilt is incorporated in Delaware and maintains its principal place of business at 2227 Welbilt Boulevard, New Port Richey, Florida 34655.  Welbilt's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "WBT."  Welbilt is a leading commercial foodservice equipment company and designs, manufactures, and supplies food and beverage equipment for the global commercial foodservice market. Welbilt offers customers operator and patron insights, collaborative kitchen solutions, culinary expertise and implementation support and service. The Company operates 21 manufacturing facilities throughout the Americas, Europe and Asia and sells through a global network of 5,000 distributors and dealers in over 100 countries.

15.     Defendant Hubertus M. Muehlhaeuser ("Muehlhaeuser") was Welbilt's Chief Executive Officer ("CEO") and President from the beginning of the Class Period until August 31, 2018 when he resigned.  Following his tenure at Welbilt, he joined CNH Industrial as President and CEO.

16.     Defendant John O. Stewart ("Stewart") was the Company's Chief Financial Officer ("CFO") and Senior Vice President from the beginning of the Class Period until April 28, 2017, the effective date of his resignation as CFO.

17.     Defendant Haresh Shah ("Shah") was the Company's CFO and Senior Vice President effective from May 1, 2017 through the end of the Class Period. Prior to being appointed CFO in May 2017, Defendant Shah served as the Vice President Corporate Controller and Chief Accounting Officer. In March 2019, Welbilt announced Defendant Shah's resignation, effective April 7, 2019.

18.     Defendants Muehlhaeuser, Stewart, and Shah are collectively referred to herein as the "Individual Defendants."

19.     Collectively, Defendant Welbilt and the Individual Defendants are herein referred to as "Defendants."

20.     Each of the Individual Defendants:

    a.     directly participated in the management of the Company;

    b.     was directly involved in the day-to-day operations of the Company at the highest levels;

    c.     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

    d.     was directly or indirectly involved in the oversight or implementation of the Company's internal controls over financial reporting;

    e.     was aware of and/or recklessly disregarded the fact that the Company was issuing false and misleading statements; and/or

    f.     approved or ratified these statements in violation of the federal securities laws.

21.     Furthermore, because of each of the Individual Defendants' positions within the Company, they had access to undisclosed, confidential, and proprietary information about Welbilt's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations and performance),

6

conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via  reports and other information provided to them in connection therewith.

22.     As officers of a publicly held company whose securities were, and are, registered with the SEC pursuant to the federal securities laws of the United States, the Individual Defendants each had a duty to disseminate prompt, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

23.     Because of their positions with the Company, the Individual Defendants possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the  ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from the public, and that the positive representations made were materially false and/or misleading. The Individual Defendants are liable for the false statements alleged herein, as

each of the false statement were "group-published" information and the result of the collective actions of the Individual Defendants.

24.     Each of the Individual Defendants are liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Welbilt's common stock because they disseminated materially false and misleading statements and/or concealed material adverse facts. The scheme: (i) deceived the investing public regarding Welbilt's business, operations, management and the intrinsic value of its stock; and (ii) caused Lead Plaintiffs and other shareholders to purchase Welbilt's stock at artificially inflated prices.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Company Background: A New Company is Born

25.     The Manitowoc Company, Inc. ("MTW" or "Manitowoc") was founded in 1902 as a shipbuilding company.  Over the years, Manitowoc grew into a multi-industry, capital goods manufacturer operating in two principal markets: cranes and related products ("Cranes") and foodservice equipment ("Foodservice"). As part of Manitowoc's Foodservice business, MTW engaged in acquisitions of established foodservice manufacturing companies.

26.     In April 2008, MTW announced that it had agreed to acquire Enodis PLC, a UK-listed commercial foodservice equipment manufacturing company ("Enodis") for $1.87 billion in cash plus the assumption of $207 million of debt.  However, shortly after that announcement, MTW's rival, Illinois Tools Works, made its own bid for Enodis, an offer that eclipsed MTW's April 2008 offer.

27.     When the bidding war over Enodis was settled, MTW announced that it had agreed to acquire Enodis for approximately $2.7 billion including the assumption of debt.

8

28.    However, the Enodis acquisition resulted in accounting and tax issues for MTW that continue to plague Welbilt to this day.

29.    In MTW's 2008 Annual Report, MTW disclosed that, as of the acquisition date (October 27, 2008), it allocated approximately $1.4 billion of the purchase price to goodwill and $819 million to acquired intangible assets.  MTW also disclosed that none of the $1.4 billion allocated to goodwill was expected to be deductible for tax purposes.

30.    In MTW's 2009 Annual Report, MTW disclosed that it revised the allocation of the Enodis purchase price previously disclosed so that it was now allocating approximately $1.3 billion of the purchase price to goodwill and $955 million to acquired intangible assets.

31.    In MTW's 2009 Annual Report, MTW also disclosed that it recognized an impairment charge of $548.8 million related to goodwill and $151.2 related to other indefinite-lived intangible assets during 2009.

32.    In MTW's 2011 Annual Report, MTW disclosed that it was revising its prior period financial statements due to errors in its income tax payable and goodwill accounts.  As a result, MTW disclosed that the goodwill impairment charge in 2009 should have been $520.3 million and not $548.8 million as previously reported.

33.    In MTW's 2012 Annual Report, MTW disclosed that it was once again revising its prior period financial statements due to errors related to its tax and goodwill accounts.

34.    One of MTW's foreign subsidiaries, Enodis Holdings Limited, filed a Report and Financial Statements for the year ended December 31, 2013 with the UK's Companies House that disclosed that it had reviewed its investment in Enodis Group Limited and concluded that its

impairment reserve was materially overstated and had been since 2009.  As a result, it restated periods back to 2009.

35.     On January 29, 2015, MTW issued a Press Release and filed a Form 8-K Current Report with the SEC announcing that MTW's Board of Directors approved a plan to separate MTW's Cranes and Foodservice business into two independent, publicly-traded companies and that the separation would be effected through a tax-free spin-off of the Foodservice business (the "Spin-Off").

36.     On July 20, 2015, MTW incorporated Manitowoc Foodservice, Inc. ("Manitowoc Foodservice") in the State of Delaware. Subsequently, MTW contributed the Foodservice business, including the business MTW acquired from Enodis, to Manitowoc Foodservice.

37.     On July 30, 2015, MTW filed Form 8-K with the SEC notifying investors that on July 28, 2015, MTW's Board of Directors appointed Defendant Muehlhaeuser as President and CEO of Manitowoc Foodservice. This appointment was made in contemplation of the pending "Spin-Off".

38.     On November 9, 2015, Defendant Stewart was appointed as CFO of the Manitowoc Foodservice.

39.     On March 4, 2016, MTW distributed all of Manitowoc Foodservice's Common Stock to MTW's shareholders on a pro rata basis and Manitowoc Foodservice became an independent publicly-traded company.

40.     On March 30, 2016, Manitowoc Foodservice filed its first Form 10-K Annual Report with the SEC, detailing that Defendant Muehlhaeuser remained as President and CEO, and Defendant Stewart remained as CFO.

10

**B.**     **Material Misstatements and Omissions During The Class Period**

41.     The Class Period begins on February 24, 2017, when, after the market closed, the Company filed a Form 10-K for the year ended December 31, 2016 (the "2016 10-K") with the SEC, which provided the Company's 2016 financial results and positions and stated that the Company's internal controls over financial reporting were effective as of December 31, 2016. Individual Defendants Muehlhaeuser, Stewart, and Shah signed and certified the 2016 10-K under the Sarbanes-Oxley Act of 2002 attesting to the accuracy of the financial statements, effectiveness of internal controls, and that all  fraud was disclosed. In pertinent part, under Item 9A, Controls and Procedures, bearing the title "Conclusion Regarding the Effectiveness of Disclosure Controls and Procedures," Defendants Muehlhaeuser and Stewart certified that:

> Our management, with the participation of the our Chief Executive Officer and Chief Financial Officer, have evaluated the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and  15d-15(e) under the Exchange Act) as of the end of the period covered by this report. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that, as of December 31, 2016, the end of such period, our disclosure controls and procedures are effective in recording, processing, summarizing, and reporting, within the time periods specified in the Commission's rules and forms, information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act, and that such information is accumulated and communicated to the Company's management, including its Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely discussions regarding required disclosure.

42.      This representation was false and misleading because, as set forth below, the Company's internal and disclosure controls and procedures were not effective in recording, processing, summarizing, and reporting the Company's financial condition.

43.     Additionally, the Defendants reassured investors in the 2016 10-K of the steps the

Company had taken to enhance its internal financial and accounting controls as follows:

> Prior to the Spin-Off, we relied on certain financial information and resources of MTW to manage aspects of our business and to report financial results. These included investor relations, corporate communications, certain accounting, tax, legal, human resources, benefit plan administration, benefit plan reporting, general management, real estate, treasury, insurance and risk management, and oversight functions, such as the Board and internal audit, which includes Sarbanes-Oxley compliance. In connection with the Spin-Off, **we enhanced our own financial, administrative, and other support systems. We are expanding our internal accounting, reporting, legal and internal audit departments and have updated our policies and systems, as needed, to meet all regulatory requirements on a stand-alone basis**. We will continue to review, document and test our internal control over financial reporting, and may from time to time make changes aimed at enhancing their effectiveness and to ensure that our systems evolve with our business. These efforts may lead to changes in our internal control over financial reporting. There were no changes in our internal control over financial reporting during the quarter ended December 31, 2016 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

(Emphasis added).

44.     On March 3, 2017, the Company changed its name from Manitowoc Foodservice, Inc. to Welbilt, Inc.

45.     On April 28, 2017, the Board appointed Defendant Shah to Senior Vice President and CFO of the Company, effective May 1, 2017. In the Company's Form 8-K filed on May 4, 2017, the Company disclosed Defendant Shah's qualifications to investors, including the fact that he joined the Company as Vice President, Corporate Controller and Chief Accounting Officer in June 2016, his seven years of prior experience in financial leadership roles at multiple companies,

a B.B.A. degree in accounting from Bernard M. Baruch College in New York, and status as a Certified Public Accountant.

46.     Defendant Shah was to become Defendant Stewart's immediate replacement. In the Company's Form 8-K filed on February 21, 2017, the Company stated that on February 16, 2017, Defendant Stewart notified the Company of his intent to retire effective April 28, 2017.

47.     On May 9, 2017, the Company filed a Form 10-Q for the quarter ended March 31, 2017 ("Q1 2017 10-Q") with the SEC, reporting the Company's first quarter 2017 financial  results and stated that the Company maintained effective internal controls over financial reporting as of March 31, 2017.  It further provided that Defendant Stewart's retirement date had been extended from April 28, 2017 to May 5, 2017.

48.     Defendants Shah and Muehlhaeuser signed and certified the Q1 2017 10-Q under the Sarbanes-Oxley Act of 2002 attesting to the accuracy of the financial statements, effectiveness of internal controls, and that all fraud was disclosed.  In pertinent part, under the section heading "Disclosure Controls and Procedures," Defendants Muehlhaeuser and Shah certified that:

> The Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, have evaluated the effectiveness of the Company's disclosure controls and procedures as such term is defined in Rules 13a-15(e) and 15(d)-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act") as of the end of the period covered by this report. Based on such evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, the Company's disclosure controls and procedures are effective in recording, processing, summarizing, and reporting, on a timely basis, information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act, and that such information is accumulated and communicated to the Chief Executive Officer and Chief

Financial Officer, as appropriate, to allow timely discussions regarding required disclosure.

49.     This representation was false and misleading because, as set forth below, the Company's internal controls were not effective in recording, processing, summarizing, and reporting the Company's financial condition.

50.     On August 9, 2017, the Company filed a Form 10-Q for the quarter ended June 30, 2017 ("Q2 2017 10-Q") with the SEC, reporting the Company's second quarter 2017 financial results and stated that the Company maintained effective internal controls over financial reporting as of June 30, 2017.

51.     Defendants Shah and Muehlhaeuser signed and certified the Q2 2017 10-Q under the Sarbanes-Oxley Act of 2002 attesting to the accuracy of the financial statements, effectiveness of internal controls, and that all fraud was disclosed. In pertinent part, under the section heading "Disclosure Controls and Procedures," Defendants Muehlhaeuser and Shah certified that:

> The Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, have evaluated the effectiveness of the Company's disclosure controls and procedures as such term is defined in Rules 13a-15(e) and 15(d)-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act") as of the end of the period covered by this report. Based on such evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, the Company's disclosure controls and procedures are effective in recording, processing, summarizing, and reporting, on a timely basis, information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act, and that such information is accumulated and communicated to the Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely discussions regarding required disclosure.

52.     This representation was false and misleading because, as set forth below, the Company's internal controls were not effective in recording, processing, summarizing, and reporting the Company's financial condition.

53.     On November 7, 2017, the Company filed a Form 10-Q for the quarter ended September 30, 2017 ("Q3 2017 10-Q") with the SEC, reporting the Company's third quarter 2017 financial results and stated that the Company maintained effective internal controls over financial reporting as of September 30, 2017.

54.     Defendants Shah and Muehlhaeuser signed and certified the Q3 2017 10-Q under the Sarbanes-Oxley Act of 2002 by attesting to the accuracy of the financial statements, effectiveness of internal controls, and that all fraud was disclosed. In pertinent part, under the section heading "Disclosure Controls and Procedures," Defendants Muehlhaeuser and Shah certified that:

> The Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, have evaluated the effectiveness of the Company's disclosure controls and procedures as such term is defined in Rules 13a-15(e) and 15(d)-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act") as of the end of the period covered by this report. Based on such evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, the Company's disclosure controls and procedures are effective in recording, processing, summarizing, and reporting, on a timely basis, information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act, and that such information is accumulated and communicated to the Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely discussions regarding required disclosure.

55.     This representation was false and misleading because, as set forth below, the Company's internal controls were not effective in recording, processing, summarizing, and reporting the Company's financial condition.

56.     On March 1, 2018, the Company filed a Form 10-K for the year ended December 31, 2017 ("2017 Form 10-K") with the SEC, reporting the Company's 2017 financial results and stated that the Company maintained effective internal controls over financial reporting as of December 31, 2017.

57.     Defendants Shah and Muehlhaeuser signed and certified the 2017 10-K under the Sarbanes-Oxley Act of 2002 by attesting to the accuracy of the financial statements, effectiveness of internal controls, and that all fraud was disclosed. Specifically in regards to the Company's internal controls over financial reporting, in Item 9A, Defendants Muehlhaeuser and Shah certified to investors that management had established and presently maintained:

> …disclosure controls and procedures that are **designed to ensure** the that [sic] information required to be disclosed by the Company in reports that the Company files or submits under the Securities Exchange Act of 1934, as amended, is **recorded, processed, summarized, and reported** within the time periods specified in the Securities and Exchange Commission's rules and forms, and that **such information is accumulated and communicated** to our management, including **our Chief Executive Officer and Chief Financial Officer**, as appropriate, to allow timely decisions regarding required disclosure.

(Emphasis added).

58.     Defendant Muehlhaeuser was the CEO and Defendant Shah was CFO at the time the 2017 Form 10-K was filed with the SEC.

59.     The Company's 2017 Form 10-K also included the Management's Report on Internal Control Over Financial Reporting, which stated, *inter alia*, that:

> Under the supervision and with the participation of the Company's Chief Executive Officer and Chief Financial Officer, management carried out an **evaluation of the effectiveness of the Company's internal control** over financial reporting as of December 31, 2017, based on the framework set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control— Integrated Framework (2013) (the "2013 framework"). Based on that evaluation, management concluded that, as of December 31, 2017, the Company's internal control over financial reporting was **effective**.

(Emphasis added).

60.     These representations were false and misleading because, as set forth below, the Company's internal controls were not effective in recording, processing, summarizing, and reporting the Company's financial condition and the Company had not carried out an adequate evaluation of the effectiveness of the Company's internal controls.

61.     On April 19, 2018, the Company expanded its business into hot beverage equipment and its geographic presence in Europe and Asia by acquiring Crem International Holding AB ("Crem") from Avaj International Holding AB for approximately $224 million.

62.     On May 8, 2018, the Company filed a Form 10-Q for the quarter ended March 31, 2018 ("Q1 2018 10-Q") with the SEC, reporting the Company's first quarter 2018 financial results and stated that the Company maintained effective internal controls over financial reporting as of March 31, 2018.

63.     Defendants Shah and Muehlhaeuser signed and certified the Q1 2018 10-Q under the Sarbanes-Oxley Act of 2002 by attesting to the accuracy of the financial statements, effectiveness of internal controls, and that all fraud was disclosed.  In pertinent part, under the section heading "Disclosure Controls and Procedures," Defendants Muehlhaeuser and Shah certified that:

17

> The Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, have evaluated the effectiveness of the Company's disclosure controls and procedures as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act") as of the end of this reporting period. Based on this evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of this reporting period, the Company's disclosure controls and procedures were effective.

64.     This representation was false and misleading because, as set forth below, the Company's internal controls were not effective in recording, processing, summarizing, and reporting the Company's financial condition.

65.     On August 9, 2018, the Company filed a Form 10-Q for the quarter ended June 30, 2018 ("Q2 2018 10-Q") with the SEC, which provided the Company's second quarter 2018 financial results and positions and further stated that the Company's internal control over financial report was effective as of June 30, 2018.

66.     The Q2 2018 10-Q was signed and certified under the Sarbanes-Oxley Act of 2002 by Defendant Shah and Defendant Muehlhaeuser attesting to the accuracy of the financial statements, effectiveness of internal controls, and that all fraud was disclosed. In pertinent part, under the section heading "Disclosure Controls and Procedures," Defendants Muehlhaeuser and Shah certified that:

> The Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, have evaluated the effectiveness of the Company's disclosure controls and procedures as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act") as of the end of this reporting period. Based on this evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of this

reporting period, the Company's disclosure controls and procedures were effective.

67.     This representation was false and misleading because, as set forth below, the Company's internal controls were not effective in recording, processing, summarizing, and reporting the Company's financial condition.

68.     Defendants Muehlhaeuser and Shah stated the following regarding the Crem acquisition and its effect on the Company's internal controls over financial reporting:

> The Company completed the acquisition of Crem on April 19, 2018. SEC guidance permits management to omit an assessment of an acquired business' **internal control over financial reporting from management's assessment of internal control over financial reporting for a period** not to exceed one year from the date of the acquisition. Accordingly, management has not assessed Crem's internal control over financial reporting as of June 30, 2018. Excluding the acquisition, **there was no change in our internal controls over financial reporting** (as defined in Rule **13a-15(f)** of the Exchange Act) that occurred during the period covered by this Quarterly Report on Form 10-Q **that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting**. The Company is in the process of integrating Crem into its existing control procedures from its date of acquisition. The Company does **not** anticipate the integration of the acquired company to result in changes that would materially affect its internal control over financial reporting.

(Emphasis added).

69.     The statements in ¶ 41-68 above were materially false and misleading because they misrepresented and failed to disclose the following adverse facts regarding the Company's business which were known to all Defendants or recklessly disregarded by them. Specifically, Defendants failed to disclose that: (i) Welbilt lacked effective internal controls over financial reporting; (ii) Welbilt incorrectly recorded the tax basis of a foreign subsidiary and incorrectly

19

amortized that subsidiary's intangible assets; and (iii) as a result of the foregoing, Defendants' statements about Welbilt's business were false and misleading and/or lacked a reasonable basis.

70.     Furthermore, the Company had not, as of that date: (i) implemented adequate control procedures for the review, analysis and reporting of its income tax accounts, including control procedures relating to the income tax effects of non-routine transactions and intercompany obligations; (ii) engaged an external consulting firm to review and recommend additional control enhancements; (iii) required the separation of execution and approval of payments as well as conducting employee training for the Crem business; (iv) performed sufficiently frequent reviews of payables entries and bank statements; (v) updated the authorized signatories over banking activities to increase oversight of banking and lending relationships to better safeguard cash; (vi) increased the frequency of review and analysis over cash disbursements; (vii) implemented new and enhanced internal control activities as to the review of exchange rate changes on cash; (viii) implemented control activities over the review of the completeness and accuracy of data related to the cash receipts on beneficial interest in sold receivables for accurate accounting treatment and presentation; (ix) enhanced procedures over the review of the classification of transactions; (x) completed a detailed risk assessment of the tax processes; (xi) identified additional or modified internal controls necessary to ensure completeness and accuracy of accounting for the income tax effects of non-routine transactions and intercompany obligations; or (xii) ensured that impacts of additional guidance changes to the Tax Cut and Jobs Act are reviewed with the appropriate level of precision.

71.     Instead, the Company would be forced to implement each of the remedial measures set forth above in subsequent reporting periods.

20

C. **Resignation and Change of Leadership in the Weeks Before the Truth Is Revealed**

72.    On August 14, 2018, the Company filed a Form 8-K Current Report with the SEC announcing that Defendant Muehlhaeuser was resigning as Director, President, and CEO of the Company, effective August 31, 2018, to become a CEO at a unrelated company.

73.    The Company further reported that the Board of Directors appointed Josef Matosevic to assume the role of interim President and CEO, effective September 1, 2018. Matosevic served as Senior Vice President and Chief Operating Officer of Welbilt since 2015 and served as an Executive Vice President for Global Operations and Purchasing in MTW's Cranes business from 2012 to 2014.

74.    On October 29, 2018, the Company filed a Form 8-K Current Report with the SEC announcing that on October 25, 2018, the Company's Board of Directors appointed William C. Johnson as President and CEO.  The appointment would be effective "as of the day immediately following the day upon which the Company's Quarterly Report on Form 10-Q for the period ended September 30, 2018 is filed."  Ultimately, this appointment would take effect November 9, 2018. Unlike Matosevic, Johnson was an external hire with no prior employment history with either Welbilt or MTW.

D. **The Truth Begins to Emerge**

75.    During the very brief interim period between Defendant Muehlhaeuser's resignation as President and CEO and the appointment of William Johnson to replace him, interim President and CEO Josef Matosevic concluded that the Company maintained ineffective internal controls over financial reporting.

76.     Specifically, on November 5, 2018, prior to the opening of the markets, Welbilt

filed a Form 8-K Current Report with the SEC announcing Non-Reliance on Previously Issued

Financial Statements ("November 2018 Non-Reliance Form 8-K"). Therein, the Company stated:

> **NON-RELIANCE ON PREVIOUSLY ISSUED FINANCIAL STATEMENTS OR A RELATED AUDIT REPORT OR COMPLETED INTERIM REVIEW**
>
> On November 3, 2018, the Audit Committee of the Board of Directors of Welbilt, Inc. (the "Company"), after considering the recommendation of management and after consulting with PricewaterhouseCoopers LLP, the Company's independent registered public accounting firm ("PwC"), determined that the Company's previously issued consolidated financial statements as of and for the year ended December 31, 2016 and the related report of PwC as it relates to such period as included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2017 **should no longer be relied upon because of prior period errors**. The errors primarily relate to the computation of income taxes associated with intercompany distributions by foreign entities and intercompany obligations in accordance with underlying agreements.
>
> During the third quarter of 2018, the Company identified errors in the tax basis of a foreign subsidiary and incorrect amortization of the intangible assets held by the same entity. **These errors, which related to a U.S. tax election made in connection with a 2008 acquisition, impacted the tax determinations of certain intercompany distributions between foreign subsidiaries, thereby resulting in an understatement of the U.S. tax liability**.
>
> In addition, the Company discovered certain intercompany transactions were not recorded on a timely basis. While these transactions have no impact to the Company's consolidated pre-tax book income, they did result in an **incorrect recognition of income tax expense or benefit recognized in each applicable jurisdiction, thereby resulting in an understatement of the U.S. tax liability**.
>
> Based on its preliminary assessment, the Company estimates the aggregate impact of these tax related errors, along with other previously identified errors that were recorded as out of period

adjustments, on consolidated net earnings, calculated in accordance with accounting principles generally accepted in the U.S., to be as follows: decrease by approximately $1.0 million to $2.0 million for the year ended December 31, 2015, decrease by approximately $7.0 million to $9.0 million for the year ended December 31, 2016 and decrease by approximately $1.0 million to $2.0 million for the year ended December 31, 2017. Because the Company has not yet fully completed its review, the estimated impact set forth above is preliminary and subject to change.

(Emphasis added).

77.     In the same statement, the disclosure detailed the affected financial statements:

The Company intends to file an amended Annual Report on Form 10-K for the year ended December 31, 2017 (the "Form 10-K/A") as soon as practicable. The consolidated financial statements of the Company as of and for the year ended December 31, 2016 will be restated, and as of and for the years ended December 31, 2015 and 2017 **are expected to be revised**, in each case, to reflect the correction of these tax errors. In addition, certain other adjustments, previously determined to be immaterial, individually and in the aggregate, will also be corrected in the restated and revised consolidated financial statements included in the Form 10-K/A. All relevant footnotes to the consolidated financial statements in the Form 10-K/A will also be restated or revised to reflect the items discussed above. In addition, **all previously filed 2018, 2017 and 2016 quarterly information are expected to be revised**.

The Company has reassessed the effectiveness of the Company's internal control over financial reporting and disclosure controls and procedures in light of the errors described above. The Company has determined that **a material weakness relating to income taxes existed as of December 31, 2017 and through September 30, 2018, and therefore the Company's internal controls over financial reporting and disclosure controls and procedures for income taxes were ineffective.** In addition, the Company will also **restate management's report** on internal control over financial reporting and its evaluation of disclosure controls and procedures (included in its Annual Report on Form 10-K for the fiscal year ended December 31, 2017) and will receive an **adverse opinion on the internal control over financial reporting as of December 31, 2017 from PwC. Since management has not completed its evaluation of the impact of**

**the errors on its internal control over financial reporting, there can be no assurance that additional control deficiencies which represent material weaknesses will not be identified.** Further details and remediation plans will be included in the Form 10-K/A. The Audit Committee of the Board of Directors has discussed the matters disclosed in this Item 4.02 with PwC.

(Emphasis added).

78.     According to the Company, a "material weakness" is "a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis."

79.     With respect to the shocking revelation, the Company issued the following press release:

> During the third quarter of 2018, the Company identified errors in the tax basis of a foreign subsidiary and incorrect amortization of the intangible assets held by the same entity. These errors, **which related to a U.S. tax election made in connection with a 2008 acquisition**, impacted the tax determinations of certain intercompany distributions between foreign subsidiaries thereby resulting in an understatement of the U.S. tax liability. In addition, the Company discovered certain intercompany transactions were not recorded on a timely basis. While these intercompany transactions have **no impact to the Company's consolidated pre-tax book income, they do impact the income tax expense.** As management determined the impact of these and other previously identified errors to 2016 to be material, it is restating its 2016 financial results. Management is expecting to revise its financial statements for 2017 and 2015. In addition, all previously filed 2018, 2017 and 2016 quarterly information are expected to be revised.
>
> The financial results included in this press release reflect the estimated impact of these restatements and revisions and should be considered preliminary. For reconciliations between previously reported and revised amounts relating to the periods presented in this release, refer to the tables appearing at the end of this press

release under the heading "Revision of Prior Period Results." Additional information regarding the revisions will be included in the Company's Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2018.

As a result of the errors identified, **the Company has determined that a material weakness in its internal control over financial reporting related to accounting for income taxes exists**. Accordingly, the Company will restate management's report on internal control over financial reporting and its evaluation of disclosure controls and procedures (included in it Annual Report on Form 10-K for the fiscal year ended December 31, 2017) and will receive an **adverse opinion on the internal control over financial reporting as of December 31**, 2017 from PricewaterhouseCoopers LLP.

For more information, please see the Current Report on Form 8-K that the Company previously filed on November 5, 2018.

(Emphasis added).

80.     As a result of this news, the price of the Company's stock collapsed, dropping *approximately 26.19%*, or $5.06 per share, from $19.32 per share on Friday, November 2, 2018, to close at $14.26 on Monday, November 5, 2018, on abnormally high trading volume with over 8.5 million shares traded on November 5, 2018.



**E.**    **The Company's Explanation and Analyst Reaction On the Day Of The Collapse**

81.    On the morning of the revelation of the Company's 2015-2018 revisions and restatement, the Company held an earnings call with analysts and investors for the purpose of discussing the third quarter financial results.

82.    Neither Incoming CEO Johnson or Interim CEO Matosevic addressed the tax errors or record-keeping failures the Company previously disclosed, but rather focused on the growth in the third quarter's organic net sales and adjusted operating EBITDA, the Crem acquisition's contribution of inorganic growth, and increases to material cost inflation that negatively impacted the Company's margins. CEO Matosevic concluded his remarks by emphasizing that "[t]his was the 13th consecutive quarter of year-over-year adjusted operating EBITDA improvement."

83.    Defendant Shah, as CFO, did address the identified errors. At the conclusion of his prepared remarks, he stated as follows:

Before we move to Q&A, I need to call your attention to the Form 8-K that we filed earlier this morning. During **our third quarter closing procedures**, we've identified errors relating to tax that impact prior periods. Management has determined the impact on 2016 to be material, so we will be restating our 2016 financial results. Please refer to the 8-K for our complete statement. That concludes my comments. Operator, we will now open up the call for questions.

(Emphasis added).

84.     During the Q&A, Rob Wertheimer, of Melius Research LLC ("Melius"), raised a question to Defendant Shah regarding the timing of the purported discovery of the errors. Their exchange, in pertinent part, was as follows:

**Melius**: Okay. Thanks. And, Haresh, was there anything different in your **closing procedures** this quarter that caused the tax issue to pop up?"

**Defendant Shah**: It is the further refinement of the **new** tax rules. And as you may know, in **September**, they published hundreds of pages more of guidance on clarity what we needed to do and that drove that review back for us.

**Melius**: Perfect. Thank you.

(Emphasis added).

85.     But this explanation does not comport with Accounting Standards Codification ("ASC") Topic 740, *Income Taxes*, whereby a company is required to recognize the effects of changes in tax laws and rates including any retroactive effects of changes in tax laws **in the period in which the new legislation is enacted**. *The Tax Cuts and Jobs Act of 2017* was enacted in December 2017. Therefore, that legislation would not have required the Company to restate or revise its 2015 or 2016 financial statements.

86.     That same day, William Blair & Company ("WB") published a report entitled "*All Progress Reversed: From Great Growth Story to Transition Story With Surprise Reset*," which included commentary and analysis on the Company's performance and identified the Company's announcement of the material weakness as one of the reasons that "caused the stock to melt down."

### F.     An Incomplete Picture; Additional Errors Come into Focus

87.     On November 9, 2018, the Company filed a Form NT 10-Q "Notification of Inability to Timely File Form 10-Q" in regards to the deadline to file their 10-Q for the quarterly period ended September 30, 2018.  In its explanation for the "unexpected delays in filing," the Company referenced the November 2018 Non-Reliance Form 8-K, its intentions to file: (i) an amended Annual Report on Form 10-K for the year ended December 31, 2017 (the "Form 10-K/A"); restated consolidated financial statements for the year ended December 31, 2016; and (iii) revised consolidated financial statements for the year ended December 31, 2015 to reflect the correction of these tax errors.

88.     On November 20, 2018, the Company filed a Form 10-Q for the quarter ended September 30, 2018 ("Q3 2018 10-Q"), reporting the Company's third quarter 2017 financial results and an Amended Form 10-K/A for the year ended December 31, 2017 (the "2017 Form 10-K/A").  The 2017 Form 10-K/A's stated purpose was to restate the previously issued consolidated financial statements and related disclosures for the year ended December 31, 2016, as well as to revise the consolidated financial statements for the years ended December 31, 2017, and December 31, 2015.

89.     In both the Q3 2018 10-Q and the 2017 Form 10-K/A, the Company described the principal errors in its previously issued financial statements using the same language from the November 5, 2018 Form 8-K, describing the errors as relating to internal record-keeping where "certain intercompany transactions were not recorded on a timely basis" and to the "the tax basis of a foreign subsidiary and incorrect tax amortization of the intangible assets held by the same entity."  The net result of these errors related to a U.S. tax election made in connection with a 2008 acquisition and led to an understatement of the Company's U.S. tax liabilities.  See Exhibit A attached hereto for a complete list of the consequences of the Company's revisions and restatement.

90.     Notably, the Company chose to not provide any details to its investors regarding the "tax election," "intercompany transactions," "foreign subsidiary," or "intangible assets" that were referred to in the language above.

91.     In addition to the initially disclosed errors, the Company also disclosed that additional tax errors from the same period had been discovered.  These additional errors were disclosed in the 2017 Form 10-K/A with the caveat that the errors were "included but not limited" to the below:

> a.     $2.7 million understatement of the loss incurred on early extinguishment of debt in 2016, which was initially identified and corrected for as an out-of-period correction in 2017;
>
> b.     $2.9 million of net tax errors that primarily originated prior to 2016 and would have increased net parent company investment prior to the Spin-Off, which were identified and initially corrected for as an out-of-period correction in 2016; and
>
> c.     In 2016, subsequent to the initial accounting for the Spin-Off, the Company incorrectly reduced the carrying value of deferred tax liabilities through a credit to retained earnings of $7.2

> million. In 2017, the Company adjusted for this error through an
> out-of-period adjustment to additional paid-in capital, which
> then resulted in a misclassification between cumulative retained
> earnings and additional paid-in capital.

92.     In its 2017 Form 10-K/A, the Company disclosed that the combined impact of the

tax errors disclosed on November 5, 2018, with the above additional errors, resulted in a \$5.4

million net understatement of the Company's previously reported income tax expense in 2016, a

21.3% increase over the income tax expense amount originally reported.  Moreover, the Company

disclosed revised earnings per share for 2016 that was 10.34% lower than originally reported.

93.     Although the above errors also impacted the Company's previously issued 2017

and 2015 financial statements, the Company made the assessment that the impact did not require a

restatement. Thus, the Company opted to revise the 2015 and 2017 financial statements in the

2017 Form 10-K/A.

### G.     Additional Errors Disclosed in 2018

94.     In addition to the errors that had been disclosed on November 5, 2018, and in the

2017 Form 10K/A, the Company disclosed additional errors in the Q3 2018 10-Q that had not

previously been disclosed. With the caveat that the Company's disclosure was "not limited" to the

errors below, the Company revealed the following:

> a.     **Cash flows misclassification** of \$4.0 million related to
> withholding taxes associated with stock-based compensation has
> been revised as cash flows from financing activities instead of
> operating activities in the unaudited consolidated statement of cash
> flows for the nine months ended September 30, 2017; and

> b.     \$3.6 million and \$4.5 million **understatement** of foreign
> currency translation adjustments in the three months ended March
> 31, 2017, and the six months ended June 30, 2017, respectively,
> related to the accounting for an interest rate swap contract, which

was originally identified and corrected for as an out-of-period adjustment in the three months ended September 30, 2017.

(Emphasis added).

95.     In the Q3 2018 10-Q, the Company disclosed that in order to fully reflect the above errors, it would revise the following:

> …previously issued unaudited consolidated financial statements for the three and nine months ended September 30, 2017 in this Form 10-Q. The Company is also disclosing the impact of the revisions on the previously filed unaudited consolidated financial statements for the three months ended March 31, 2017 and the three and six months ended June 30, 2017. Additionally, the Company is disclosing the impact of the revisions on the previously unaudited consolidated financial statements for the three months ended March 31, 2018 and three and six months ended June 30, 2018. Unaudited financial statements for the three months ended March 31, 2018 and three and six months June 30, 2018 will be revised in connection with the future filing of the Company's Form 10-Q for the three months ended March 31, 2019 and the three and six months ended June 30, 2019.

## H.     **Discovery of Misappropriation of Funds**

96.     The Company's Q3 2018 10-Q went on to disclose further evidence that the Company's internal controls were recklessly mismanaged and relied upon – specifically in regards to its subsidiaries.

97.     In the Q3 2018 10-Q, the Company stated as follows:

> On November 14, 2018, management learned of an incident that occurred in early November 2018, which resulted in the diversion of approximately **€4.0 million** from a subsidiary of the Company's recently acquired Crem business. The Company is currently investigating this matter, including the potential likelihood of recovery, if any. Based on its preliminary review as of the date of this report, management believes **the loss, net of recoveries, to be approximately €1.0 million to €3.0 million**, although this amount **may change** as the Company continues with its investigation. The Company also has disclosed the matter to local authorities and is

> cooperating with them in their investigation. The Company does not currently expect the impact of this incident to be material to its business, results of operations or financial condition.

(Emphasis added).

## I.      The Initial Conclusion – the Controls were Defective as of December 31, 2017

98.      In its November 20, 2018, SEC filings, Company management explained how it carried out an evaluation of the effectiveness of its internal controls over financial reporting as of December 31, 2017.  According to the 2017 Form 10K/A, this reassessment was performed under the supervision of and with the participation of the Interim CEO Matosevic and Defendant Shah. Ultimately, the Company concluded:

> …it did not design and maintain effective internal controls over the **accounting for income taxes**. Specifically, certain control activities over the completeness and accuracy of accounting for the income tax effects of **(i) non-routine transactions and (ii) intercompany obligations in accordance with underlying agreements** were not performed **on a timely basis or at the appropriate level of precision**. These control deficiencies resulted in the **misstatement of the income tax accounts and related financial disclosures**, the restatement of the Company's consolidated financial statements for the year ended December 31, 2016 and the revision of the Company's consolidated financial statements for the years ended December 31, 2017 and 2015 and quarterly periods in 2017 and 2016. Additionally, these control deficiencies **could result in additional misstatements** of the aforementioned balances and disclosures that would result in a material misstatement to the Company's annual or interim consolidated financial statements that would not be prevented or detected.

(Emphasis added).

99.      Additionally, the misappropriation of funds in connection with the Crem business demonstrated that as of September 30, 2018, the Company "did not maintain effective internal

controls over cash disbursements at the Crem business, which was acquired in April 2018, allowing for the misappropriation of Company assets." Specifically, management determined that the same employee handled both the processing and the approval for payments of cash disbursements.

100.    The result of this material weakness in its internal controls led to the misappropriation of approximately **€4.0 million**. The Company went on to admit that generally speaking, such a control deficiency "could result in a misstatement of cash, accounts payable, earnings from operations and income tax accounts and disclosures that would result in a material misstatement to the interim or annual consolidated financial statements that would not be prevented or detected."

**J.      Reassessment and Remediation**

101.    In its 2017 Form 10K/A, the Company addressed its earlier, false statements regarding the evaluations of the effectiveness of disclosure controls and procedures as follows:

> Management has **reassessed** its evaluation of the effectiveness of its internal control over financial reporting as of December 31, 2017, **based on the framework established in Internal Control-Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).** As a result of that reassessment, management identified a material weakness and, accordingly, has concluded that the Company did <u>not</u> maintain effective internal control over financial reporting as of December 31, 2017…. In addition, the Company's independent registered public accounting firm has restated their report on the Company's internal control over financial reporting and **issued an adverse opinion**.

(Emphasis added).

102.    The "reassessment" that led to the identification of a material weakness involving Interim CEO Matosevic (whose tenure as Interim CEO spanned no more than one financial

33

quarter) and Defendant Shah, and the evaluation in the Company's original 2017 Form 10-K with Defendant CEO Muehlhaeuser and Defendant Shah, were both based on the same framework.  As the Company stated in its original 2017 Form 10-K:

> Under the supervision and with the participation of the Company's Chief Executive Officer and Chief Financial Officer, management carried out an evaluation of the effectiveness of the Company's internal control over financial reporting as of December 31, 2017**, based on the framework set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control—Integrated Framework (2013) (the "2013 framework").** Based on that evaluation, management concluded that, as of December 31, 2017, the Company's internal control over financial reporting was effective.

(Emphasis added).

103.    In its 2017 Form 10-K/A, the Company also described its "Remediation Plan" as follows:

> In response to the identified material weakness, management, with the oversight of the Audit Committee of the Board of Directors, will take comprehensive actions to remediate the material weakness in internal control over financial reporting, including:
>
> - implementing **additional specific enhanced control procedures** for the **review, analysis and reporting** of its income tax accounts, including control procedures relating to the income tax effects of non-routine transactions and intercompany obligations; and
>
> - engaging an **external consulting firm** to review and recommend additional control enhancements.

(Emphasis added).

104.    The Company further cautioned that it was "unlikely that management will have successfully remediated this material weakness in 2018 in consideration of the timing of when this material weakness was identified."

34

**K.**    **Additional Resignations**

105.    On November 29, 2018, the Company filed a Form 8-K with the SEC to announce the resignation of Andreas G. Weishaar, Executive Vice President and Chief Transformation and Digital Officer, effective January 3, 3019, to "pursue other opportunities." Per the Company's Form 8-K, Weishaar informed the Company of his intent to resign on November 27, 2018. Upon information and belief, Mr. Weishaar joined the same company that Defendant Muehlhaeuser joined following his departure from Welbilt – CNH Industrial NV.

106.    On March 18, 2019, the Company filed a Form 8-K with the SEC to announce the appointment of Martin D. Agard as Executive Vice President and CFO, effective April 8, 2019, and the appointment of Jamie E. Palm as Vice President, Corporate Controller, and Chief Accounting Officer. In the same Form 8-K, the Company stated that principal accounting responsibilities would be transferred from Defendant Shah to Ms. Palm, and that Defendant Shah would be leaving the company to "pursue external opportunities."

**L.**    **The Company's Internal Controls Remain Inadequate**

107.    On February 19, 2019, the Company filed Form 8-K with the SEC to announce the Company's earnings for the quarter and year ended December 31, 2018. The Company announced that it had "identified certain errors in its previously issued consolidated financial statements as of and for the years ended December 31, 2017 and 2016 and in its 2018 and 2017 unaudited condensed consolidated quarterly financial statements." These errors were disclosed as follows:

> a.    A classification error related to a foreign short-term time deposit with an original maturity greater than three months was incorrectly classified as a cash and cash equivalent instead of a short-term investment. This error resulted in an overstatement in cash and cash equivalents and an understatement in short-term investments of $19.9 million and $18.7 million as of December 31,

2017 and December 31, 2016, respectively. The error also resulted in an overstatement in cash from investing activities of $18.7 million for the year ended December 31, 2016, and $14.3 million for each of the three months ended March 31, 2018, the six months ended June 30, 2018, and the nine months ended September 30, 2018.

b.      A calculation error related to the adoption of Accounting Standards Update 2016-15 ("ASU 2016-15"), "Statement of Cash Flows (Topic 230): Classification of Certain Cash Receipts and Cash Payments," in 2018. As required by ASU 2016-15, the Company retrospectively applied the impact of such adoption to the corresponding 2017 periods in each of its 2018 Form 10-Q filings. Subsequent to the adoption and retrospective application of ASU 2016-15, an error was identified in the amount of previously reported cash receipts on beneficial interest in sold receivables. This error resulted in an overstatement (understatement) in cash flow from operating activities and the offsetting impact to investing activities of ($3.9) million and $5.8 million in the three months ended March 31, 2018 and 2017, ($20.9) million and $5.8 million in the six months ended June 30, 2018 and 2017, and ($43.4) million and $5.8 million in the nine months ended September 30, 2018 and 2017, respectively.

c.      A calculation error related to the effect of exchange rate changes which resulted in an overstatement of cash flows from operating activities of $16.2 million and $1.8 million for the years ended December 31, 2017 and December 31, 2016 on the statement of cash flows. This error also resulted in an overstatement of cash flows from operating activities of $8.8 million and $3.6 million for the three months ended March 31, 2018 and 2017, $3.3 million and $7.2 million for the six months ended June 30, 2018 and 2017, and $1.2 million and $14.0 million for the nine months ended September 30, 2018 and 2017.

108.   Even though the Company disclosed that these errors had "no effect" on the Company's consolidated statements of operations, comprehensive income or equity for any period previously discussed, the Company stated that it expected to disclose that its internal controls over disclosures and financial reporting were not effective as of December 31, 2018 and that it would receive an adverse opinion on internal controls from PricewaterhouseCoopers LLP ("PwC").

109. On March 1, 2019, the Company filed its Form 10-K Annual Report with the SEC for the year ended December 31, 2018 ("2018 10-K"). In it, the Company confirmed that by its own evaluation the internal controls over disclosures and financial reporting were not effective as of December 31, 2018. The 2018 10-K included PwC's audit report containing the following adverse opinion on the Company's internal controls:

> Also in our opinion, the Company did not maintain, in all material respects, effective internal control over financial reporting as of December 31, 2018, based on criteria established in *Internal Control Integrated Framework* (2013) issued by the COSO because material weaknesses in internal control over financial reporting existed as of that date related to ineffective controls with respect to (i) risk assessment controls related to the design and operating effectiveness of the Company's internal control over financial reporting, (ii) accounting for income taxes, (iii) cash disbursements at the Crem business, and (iv) the presentation of the statement of cash flows.

110. As a Risk Factor to prospective investors, the Company stated that:

> **We have identified material weaknesses in our internal control over financial reporting which, if not timely remediated, may adversely affect the accuracy and reliability of our financial statements, and our reputation, business and the price of our common stock, as well as lead to a loss of investor confidence in us.**
>
> We are taking steps to remediate these material weaknesses. While we believe these steps will improve the effectiveness of our internal control over financial reporting and remediate the identified deficiencies, if our remediation efforts are insufficient to address the material weaknesses or we identify additional material weaknesses in our internal control over financial reporting in the future, our ability to record, process, summarize and report information required to be disclosed within the time periods specified by the rules and forms of the SEC and to otherwise comply with our reporting obligations under the federal securities laws and our long-term debt agreements will likely be adversely affected. The occurrence of, or failure to remediate, these material weaknesses and any future material weaknesses in our internal

control over financial reporting may adversely affect the accuracy and reliability of our financial statements and have other consequences that could materially and adversely affect our business, including an adverse impact on the market price of our common stock, potential actions or investigations by the SEC or other regulatory authorities, possible defaults under our debt agreements, shareholder lawsuits, a loss of investor confidence and damage to our reputation.

111.    The Company also disclosed that the failure to design and maintain effective risk assessment controls related to the design and operating effectiveness of the Company's internal control over financial reporting, contributed to a failure to design and maintain effective internal controls over the accounting for income taxes, a failure to maintain effective internal controls over cash disbursements at the Crem business, and a failure to design and maintain effective internal controls over the presentation of the statements of cash flows.

112.    These issues resulted in the revision of previously issued consolidated financial statements for the years ended December 31, 2017 and 2016, for the quarterly periods in 2017 and for the three months ended March 31, 2018, three and six months ended June 30, 2018 and three and nine months ended September 30, 2018.

113.    On May 8, 2019, the Company filed its Form 10-Q for the first quarter of 2019 ("Q1 2019 10-Q"). In its report on Controls and Procedures, the Company stated as follows:

Management carried out an evaluation, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, of the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this report. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that, **as of March 31, 2019,** due to the identification of material weaknesses in our internal control over financial reporting previously identified and reported in our 2018 Annual Report on Form 10-K ("2018 Form 10-K") which, as described below,

> **continue to exist, our disclosure controls and procedures were
> not effective**.

(Emphasis added).

114.     The Company reported having taken the following additional remediation steps

during the three months ended March 31, 2019:

> We developed and implemented new and enhanced internal control
> activities over review of the following with the statements of cash
> flows: (i) exchange rate changes on cash, (ii) completeness and
> accuracy of the cash receipts on beneficial interest in sold
> receivables for accurate accounting treatment and presentation and
> (iii) classification of transactions, and
>
> Through an external consulting firm, we have completed a detailed
> risk assessment of the tax processes and have begun refining the
> processes and identifying additional internal controls or modifying
> existing internal controls necessary to ensure risks are
> appropriately addressed.

115.     On August 7, 2019, the Company filed its Form 10-Q for the second quarter of

2019 ("Q2 2019 10-Q"). In its report on Controls and Procedures, the Company  stated as follows:

> Management carried out an evaluation, under the supervision and
> with the participation of our Chief Executive Officer and Chief
> Financial Officer, of the effectiveness of our disclosure controls
> and procedures (as such term is defined in Rules 13a-15(e) and
> 15d-15(e) under the Exchange Act) as of the end of the period
> covered by this report. Based on such evaluation, our Chief
> Executive Officer and Chief Financial Officer have concluded that,
> **as of June 30, 2019**, due to the material weaknesses in our internal
> control over financial reporting previously identified and reported
> in our 2018 Annual Report on Form 10-K ("2018 Form 10-K")
> which, as described below, **continue to exist, our disclosure
> controls and procedures were not effective**.

(Emphasis added.)

116.    The Company reported having taken the following additional remediation steps during the six months ended June 30, 2019. In regards to the external consulting firm's risk assessment of the Company's tax processes, the Company reported:

> Through the use of an external consulting firm, we completed a detailed risk assessment of the income tax processes. Based on the risk assessment, we identified additional or modified internal controls necessary to ensure (i) completeness and accuracy of accounting for the income tax effects of non-routine transactions and intercompany obligations in accordance with underlying agreements are performed on a timely basis and reviewed with the appropriate level of precision and (ii) impacts of additional guidance changes to the Tax Cut and Jobs Act are reviewed with the appropriate level of precision. We have refined the income tax processes to incorporate these enhanced internal controls, which were implemented during the second quarter of 2019.

### M.    Summary of Factual Allegations

117.    The Company announced numerous material weaknesses in its internal controls over financial reporting beginning in 2018.  First, in November 2018, the Company announced: (i) errors related to the computation of income taxes associated with a foreign subsidiary made in connection with a 2008 acquisition; (ii) errors in the tax basis of a foreign subsidiary and incorrect amortization of the intangible assets held by the same entity; (iii) ineffective internal controls over financial reporting and disclosure controls and procedures for income taxes; (iv) improper recording of  intercompany transactions; (v) ineffective controls over cash disbursements at the Crem business.   See Exhibit A at § I for a complete recitation of the disclosed material weaknesses.

118.    In connection with the November 2018 announcement, the Company conceded that it did not design and maintain effective internal controls over the accounting for income taxes and that certain control activities over the completeness and accuracy of accounting for the income tax

effects of certain transactions were not performed on a timely basis or at the appropriate level of precision.  See *id*.

119.    In March of 2019, the Company announced additional improper design and implementation of internal controls over the presentation of the statements of cash flows.  See *id*.

120.    The consequences of the Company's internal control weaknesses were significant. Specifically, the Company's 2016 consolidated financial statements were restated, and its 2015 and 2017 consolidated financial statements were revised.  See Exhibit A at § II for a complete recitation of the consequences of the control and material weakness failures.

121.    These failures resulted in the Company taking numerous steps to remediate the myriad of control and reporting deficiencies.  Specifically, after the Class Period and through the present, the Company announced that it: (i) implemented additional specific enhanced control procedures for the review, analysis and reporting of its income tax accounts, including control procedures relating to the income tax effects of non-routine transactions and intercompany obligations; (ii) engaged an external consulting firm to review and recommend additional control enhancements; (iii) required the separation of execution and approval of payments as well as conducting employee training for the Crem business; (iv) performed more frequent reviews of payables entries and bank statements; (v) updated the authorized signatories over banking activities to increase oversight of banking and lending relationships to better safeguard cash; (vi) increased the frequency of review and analysis over cash disbursements; (vii) implemented new and enhanced internal control activities as to the review of exchange rate changes on cash; (viii) implemented control activities over the review of the completeness and accuracy of data related to the cash receipts on beneficial interest in sold receivables for accurate accounting treatment and

presentation; (ix) enhanced procedures over the review of the classification of transactions; (x) completed a detailed risk assessment of the tax processes; (xi) identified additional or modified internal controls necessary to ensure completeness and accuracy of accounting for the income tax effects of non-routine transactions and intercompany obligations; (xii) ensured that impacts of additional guidance changes to the Tax Cut and Jobs Act are reviewed with the appropriate level of precision.  See Exhibit A at § III for a complete recitation of the remedial measures undertaken to date.

122.    **None** of these steps had been taken **during** the Class Period, during which time the Company repeatedly reassured investors that its internal controls were adequate.

123.    Most egregiously, the Company has not remediated the issues to date, and continues to disclose to shareholders that, at least as of June 30, 2019, that material weaknesses were not remedied.

124.    Furthermore, as set forth below, there were numerous red flags prior to 2018 that put the Defendants on notice of the serious and significant control and reporting deficiencies.

### V.    ADDITIONAL SCIENTER ALLEGATIONS

125.    As alleged herein, Defendants either knew or were deliberately reckless in not knowing that: (i) the statements and omissions alleged above were materially false and misleading: (ii) such statements and omissions would deceive investors into purchasing Welbilt securities at artificially inflated prices.

126.    The scope and duration of the comprehensive errors in Welbilt's financial controls regarding its accounting for income tax expenses make the faulty internal controls glaringly obvious for Defendants with executive management experience, namely Defendants

Muehlhaeuser, Stewart, and Shah. Between the Spin-Off in 2015 and the Crem acquisition in 2018, the Defendants had ample reason to scrutinize their internal controls – especially as to subsidiaries.

127. These errors were or should have been especially obvious to Defendant Shah, given that the accounting firm responsible for the above audits and financial statements was PwC. Upon information and belief, Defendant Shah was an Audit Manager at PwC for five years, and thus should have had little to no difficulty interfacing with Welbilt's auditors during the Class Period.

128. Assuming *arguendo* that the Defendants did not know of the errors, the obviousness of the errors is apparent from the circumstances of their reported discovery. Interim CEO Matosevic served as the interim-CEO of Welbilt for only 2 months in the interim period between full-time CEOs when the errors were discovered and reported.

129. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Welbilt, their control over, and/or receipt and/or modification of  Welbilt's allegedly materially misleading statements and/or their associations with the Company  which made them privy to confidential proprietary information concerning Welbilt, participated  in the fraudulent scheme alleged herein.

130. The Company was on notice of potential tax and accounting issues associated with the 2008 acquisition of Enodis because of the Company's own repeated and disclosed accounting errors regarding the acquisition.

131. As set forth above in ¶¶26-34, MTW acquired Enodis for $2.7 billion after a bidding war drove up the cost of Enodis by more than $600 million.  Within a year of the acquisition, MTW reported a $700 million impairment charge related to the Enodis acquisition and

43

followed that up with a series of documented accounting mistakes related to the acquisition that continue until this day.

        a.       Between 2008 and 2009, MTW revised the amount of the purchase price it allocated to goodwill and acquired intangible assets;

        b.       In 2011, MTW disclosed that it had incorrectly calculated the 2009 goodwill impairment charge, lowering the impairment charge by $28.5 million. In 2012, MTW disclosed it would revise prior period financial statements due to errors in its tax and goodwill accounts related to the acquisition;

        c.       One of MTW's foreign subsidiaries, Enodis Holdings Limited, filed a Report and Financial Statements for the year ended December 31, 2013 and disclosed an impairment reserve overstatement error requiring it to restate prior period financial statements back to 2009.

132.    According to MTW's 2012 Form 10-K: "During the third quarter of 2012, the company identified errors related to its deferred tax and goodwill accounts that originated in connection with certain acquisitions five to eleven years ago, resulting in an increase to deferred tax assets, goodwill, and deferred tax liabilities in the amounts of $4.0 million, $64.9 million, and $50.9 million at December 31, 2011, respectively, and a cumulative overstatement of income tax expense of $18.0 million through December 31, 2011." 2012 Form 10-K, p. 55.

133.    MTW was also on notice of potential accounting irregularities and potential restatements and revisions as a consequence of restatements and revisions in 2011 and 2012.

        a.       During the quarter ended December 31, 2011, MTW identified a $28.5 million error related to its income taxes payable and goodwill accounts that originated during

2008, resulting in the overstatement of these accounts in its previously filed financial statements. This $28.5 million error also overstated the goodwill impairment charge included in the company's Consolidated Statement of Operations for the year ended December 31, 2009. 2011 Form 10-K, p. 47.

b.      In addition, MTW had previously identified an error related to the understatement of the 2009 tax benefit by $6.6 million that had been corrected as an out-of-period adjustment in the third quarter of 2010. Id.

c.      MTW's second quarter 2012 Form 10-Q disclosed that during the second quarter of 2012, MTW recorded a $4.0 million adjustment to correct an error related to inventory, whereby for the year ended December 31, 2011 and the quarter ended March 31, 2012, MTW had incorrectly overstated inventory and understated cost of goods sold by $2.9 million and $1.1 million, respectively.  Q2 2012 10-Q, p. 6.

d.      MTW's third quarter 2012 Form 10-Q disclosed that during the third quarter of 2012 MTW identified errors related to its deferred tax liability and goodwill accounts that originated in connection with certain acquisitions five to eleven years ago, resulting in an understatement of these accounts, and a cumulative overstatement of income tax expense of $18.6 million through June 30, 2012. Q3 2012 10-Q, p. 7.

e.      In addition, MTW had previously identified an error related to the overstatement of inventory ($2.9 million in 2011 and $1.1 million in the first quarter of 2012) that had been corrected as an out-of-period adjustment in the second quarter of 2012. 2012 Form 10-K, p. 55.

134.   In its 2017 Form 10-K/A, the Company disclosed that the revisions to the 2016 financial statements resulted in a $5.4 million net understatement of the Company's previously reported income tax expense, a 21.3% increase over the amount originally reported.  Moreover, the Company disclosed revised earnings per share for 2016 that was 10.34% lower than originally reported.

135.   The discrete nature of the accounting errors also gives rise to a strong inference of scienter.

136.   The Individual Defendants were "responsible for establishing and maintaining adequate internal control over financial reporting" according to the Company's annual reports. Indeed, the Company repeatedly reiterated these responsibilities regarding management and the CEO and CFO's responsibilities in its public filings.

137.   The Individual Defendants signed Sarbanes-Oxley certifications, and had reason to know or should have suspected, due to the presence of glaring accounting irregularities and other red flags, that the financial statements contained material misstatements or omissions.

138.   The Company's quarterly disclosures explicitly touted the personal interest and participation of the Individual Defendants in evaluating the effectiveness of the Company's internal controls.  Where a statement is made repeatedly regarding an issue of specific personal interest to the officers, the allegations will more readily give rise to the requisite strong inference of scienter.

139.   The discrepancies between the admissions in the November 2018 restatement and disclosure and the repeated certifications that continued from the beginning of the class period until as late as August 2018 are stark and, consequently, give rise to scienter.

140.    The rapid discovery of the internal control issues, during the brief window between permanent CEOs, constitutes strong circumstantial evidence of the Individual Defendants' scienter.

141.    As a consequence of their senior positions, there is a strong inference that the Individual Defendants knew facts or had access to information suggesting that their public statements were not accurate or failed to check information they had a duty to monitor.

142.    The timing and circumstances of certain of certain of the Individual Defendants' resignations adds further weight to an overall inference of scienter.

143.    The fact that the Company was forced to restate its financial results is, in and of itself, probative of scienter.

144.    The fact that the Company has not fully remediated the internal control deficiencies as of the filing of this Complaint.

## VI.   LOSS CAUSATION AND ECONOMIC LOSS

145.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the Company's stock price, and operated as a fraud or deceit on acquirers of the Company's common stock. As detailed above, when the truth about Welbilt's misconduct and its lack of operational and financial controls was revealed, the value of the Company's common stock declined precipitously as the prior artificial inflation no longer propped up its stock price. The decline in Welbilt's common stock price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the common stock price decline negates any inference that the loss suffered by Lead Plaintiffs and other members of the Class was caused by changed

47

market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss, i.e., damages, suffered by Lead Plaintiffs and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the Company's stock price and the subsequent significant decline in the value of the Company's stock price when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

146.  At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Lead Plaintiffs and other Class members. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Welbilt's business, operations and financial condition, as alleged herein. Throughout the Class Period, Defendants publicly issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing Welbilt's common stock to be artificially inflated. Lead Plaintiffs and other Class members purchased Welbilt's common stock at those artificially inflated prices, causing them to suffer the damages complained of herein.

## VII.  NO SAFE HARBOR

147.  The statutory safe harbor provided for certain forward-looking statements does not apply to any of the false statements alleged herein. None of the statements alleged herein is a "forward-looking statement" and no such statement was identified as a "forward-looking statement" when made. Rather, the false and misleading statements alleged herein all relate to facts and conditions which existed in the past or existed at the time the statements were made.

Moreover, cautionary statements, if any, did not identify the important factors that could cause actual results to differ materially from those in any forward-looking statements.

148.     In the alternative, to the extent that the statutory safe harbor does apply to any statement pleaded herein that is deemed to be forward-looking, the Defendants are liable for such false forward-looking statements because, at the time each such statement was made: (i) the speaker actually knew and/or recklessly disregarded the fact that such forward-looking statement was materially false or misleading and/or omitted facts necessary to make statements previously made not materially false and misleading; and/or (ii) each such statement was authorized and/or approved by Individual Defendants, who actually knew or recklessly regarded the fact that each such statement was false and/or misleading when made.

## VIII.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

149.     At all relevant times, the market for Welbilt common stock was an efficient market for the following reasons, among others:

    a.   Welbilt's common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient market;

    b.   During the Class Period, Welbilt's common stock was actively traded, demonstrating a strong presumption of an efficient market;

    c.   As a regulated issuer, Welbilt filed periodic public reports during the Class Period with the SEC;

    d.   Welbilt regularly communicated with public investors via established market communication mechanisms;

    e.   Securities analysts employed by major brokerage firms followed Welbilt and wrote reports that were distributed to the sales force and certain customers of brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

    f. Unexpected material news about Welbilt was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

  150. As a result of the foregoing, the market for Welbilt's common stock promptly digested current information regarding Welbilt from all publicly available sources and reflected such information in Welbilt's stock price. Under these circumstances, all purchasers of Welbilt's common stock during the Class Period suffered similar injury through their purchase of Welbilt's common stock at artificially inflated prices and a presumption of reliance applies.

  151. Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security. Here, the facts withheld are material because an investor would have considered the Company's financials and adequacy of internal controls over financial reporting when deciding whether to purchase and/or sell Welbilt's stock.

## IX. <u>CLASS ACTION ALLEGATIONS</u>

  152. Lead Plaintiffs bring this action on behalf of all individuals and entities that purchased or otherwise acquired Welbilt common stock on the public market during the Class Period, and were damaged (the "Class"). Excluded from the Class are Defendants and each of their immediate family members, legal representatives, heirs, successors or assigns, and any entity in which any of the Defendants have or had a controlling interest.

  153. Welbilt had 140,218,799 shares outstanding as of November 16, 2018. Therefore, members of the Class are so numerous that joined of all members is impracticable. Throughout the Class

Period, Welbilt's stock was actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can be ascertained only through appropriate discovery, Lead Plaintiffs believe that there are thousands of members in the proposed Class.

154.   Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the Defendants' respective wrongful conduct in  violation of the federal securities laws complained of herein.

155.   Record owners and other members of the Class may  be identified from records maintained by Welbilt or its transfer agent and may be notified of the  pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class, which predominate over questions that may affect individual Class members, include, *inter alia*:

      a.   whether Defendants violated the federal securities laws by the Defendants' respective acts as alleged herein;

      b.   whether the Defendants acted knowingly and/or with deliberate recklessness in  issuing false and misleading financial statements;

      c.   whether the price of Welbilt's stock during the Class Period was artificially inflated because of the Defendants' conduct complained of herein; and

      d.   whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

156.     Lead Plaintiffs' claims are typical of those of the Class because Lead Plaintiffs and the Class sustained damages from the Defendants' wrongful conduct in a substantially identical manner.

157.     Lead Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation.   Lead Plaintiffs have no interests that conflict with those of the other members of the Class.

158.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Furthermore, as the  damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.

## X.     CLAIMS FOR RELIEF

### COUNT I
### Violation of Section 10(b) and Rule 10b-5 Against All Defendants

159.     Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully  set forth herein.

160.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; and (2) cause Lead Plaintiffs and  other members of the Class to purchase Welbilt common stock at artificially inflated prices. In  furtherance of this unlawful scheme, plan and course of conduct, each of the Defendants took the  actions set forth herein.

161.   Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Welbilt's stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

162.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Welbilt as specified herein.

163.   These Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Welbilt's value and performance  and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Welbilt and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Welbilt's common stock during the Class Period.

164.   Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (1) Individual Defendants were high-level executives, directors, and/or

agents at the Company during the Class Period and members of the Company's management team or had control thereof; (2) each Individual Defendant, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each Individual Defendant enjoyed significant personal contact and familiarity with the other Individual Defendant and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (4) each Individual Defendant was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

165.   Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Welbilt's operating condition and inadequate internal controls from the investing public and supporting the artificially inflated price of its stock. As demonstrated by Defendants' overstatements and misstatements of the Company's financial condition throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

166.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Welbilt's common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of Welbilt's publicly-traded stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiffs and the other members of the Class acquired  Welbilt's common stock during the Class Period at artificially high prices and were or will be  damaged thereby.

167.    At the time of said misrepresentations and omissions, Lead Plaintiffs and other members  of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiffs and the other  members of the Class and the marketplace known the truths regarding Welbilt's financial results and inadequate internal controls over financial reporting,  which were not disclosed by Defendants, Lead Plaintiffs and other members of the Class would not have purchased or otherwise acquired Welbilt's stock, or, if they had acquired such stock during the Class Period, they would not have done so at the artificially inflated prices that they  paid.

168.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

169.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the  other members of the Class suffered damages in connection with their respective purchases and   sales of the Company's common stock during the Class Period.

170.    This action was filed within two years of discovery of the fraud and within five years of each Lead Plaintiff's purchases of common stock giving rise to the cause of action.

## COUNT II
### The Individual Defendants Violated Section 20(a) of the Exchange Act

171.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully  set forth herein.

172.    The Individual Defendants acted as controlling persons of Welbilt within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Lead Plaintiff contends are false and misleading. The Individual Defendants provided  with or had unlimited access to copies of the Company's reports, press releases, public filings and  other statements alleged by Lead Plaintiff to have been misleading prior to and/or shortly  after  these statements were issued and had the ability to prevent the issuance of the statements or to cause the  statements to be corrected.

173.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

56

174.    As set forth above, Welbilt, and the Individual Defendants each violated Section 10(b), and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

175.    By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

176.    This action was filed within two years of discovery of the fraud and within five years of each Lead Plaintiff's purchases of common stock giving rise to the cause of action.

## XI.    **PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

a.    Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b.    Awarding compensatory damages in favor of Lead Plaintiffs and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of the Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.    Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in the prosecution of this action, including reasonable attorney's fees and expert fees;

      d.     Granting extraordinary equitable and/or injunctive relief as permitted by law; and

      e.     Such other and further relief as the Court may deem just and proper.

## XII.   <u>JURY TRIAL DEMANDED</u>

Lead Plaintiffs hereby demand a jury trial.

Dated: August 19, 2019

**TOMCHIN & ODOM, P.A.**

*/s/ Kenneth A. Tomchin*
Kenneth A. Tomchin, Esq.
Florida Bar No. 0724955
Brett P. Abner, Esq.
Florida Bar No. 0707996
6816 Southpoint Parkway, Suite 400
Jacksonville, FL 32216
Tel: (904) 353-6888
Fax: (904) 353-0188
Tomchin@tomchinandodom.com
BAbner@tomchinandodom.com
pleadings@tomchinandodom.com

*Local Counsel for Lead Plaintiffs and the Class*

**WOLF HALDENSTEIN**
**ADLER FREEMAN & HERZ LLP**

Matthew M. Guiney
Regina Calcaterra
270 Madison Avenue
New York, NY 10016
Tel: 212-545-4600
Fax: 212-686-0114
Guiney@whafh.com
Calcaterra@whafh.com

*Counsel for the Lead Plaintiffs and the Class*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 19th day of August, 2019, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

*/s/ Kenneth A. Tomchin*
Attorney
